

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-21-00271-CV

---

IN THE INTEREST OF E.G., A CHILD

---

On Appeal from the County Court at Law No. 1
Randall County, Texas
Trial Court No. 77,407-L1, Honorable James W. Anderson, Presiding

---

March 4, 2022

## OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

In this accelerated appeal, appellants, Mother and Father, appeal the judgment of the trial court terminating their parental rights to E.G.[1]  The appellee is the Texas Department of Family and Protective Services.  Mother and Father contend the trial court exceeded the scope of de novo review when it terminated their parental rights.  Mother also challenges the sufficiency of the evidence to support the trial court's findings under

---

[1] To protect the privacy of the parties involved, we refer to the mother of the child as "Mother," the father of the child as "Father," and the child by her initials.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b).

the predicate grounds, and the finding that termination is in the best interest of E.G. We affirm the judgment of the trial court as to Mother and Father.

Background

On January 10, 2020, the Department removed E.G. from Mother's care because of mental health concerns. At the time of E.G.'s removal, Father had been incarcerated in the Randall County jail since January 5, 2020. The Department obtained temporary managing conservatorship, placed E.G. with her maternal aunt and uncle, and filed a petition to terminate Mother's and Father's parental rights. The Department created family service plans for Mother and Father setting out conditions for reunification, including: psychological evaluation and participation in individual counseling; completion of a drug assessment; engagement in any required drug treatment and submission to random drug testing; completion of rational behavior therapy; participation in anger control training; participation in therapeutic visitation; and demonstration of stable housing and employment.

The associate judge conducted a bench trial on June 7, July 23, and August 25, 2021. The following evidence was presented at trial.

Mother and J.C. are the parents of three boys, aged twelve, seven, and five at the time of trial. Mother and J.C. separated in May of 2016. Mother and Father began living together in April of 2019. Mother and Father are the parents of E.G., who was born in May of 2019. E.G. is the child subject of this appeal.

On January 9, 2020, Mother took seven-month-old E.G. and her three brothers to Northwest Hospital for a sexual assault evaluation after she found the boys "playing

2

with each other with puppets and kind of touching and grabbing each other." Mother accused J.C. of sexually assaulting the boys. The boys were examined and nothing was found to substantiate the sexual abuse allegations. Upon leaving the hospital, Mother took the children to Trinity Fellowship Church in search of a sexual abuse advocate.

Rita Wilkinson, one of the pastors at the church, encountered Mother in the children's area of the church. According to Wilkinson, Mother was, yelling, "talking really crazy," and not making sense. She said her husband was Lucifer, and he was speaking to her and telling her what to do. Wilkinson concluded that Mother was hearing voices. Wilkinson testified that Mother was not stable. While Mother was talking, "she was very agitated, very anxious, couldn't give eye contact, couldn't be still. Would snap at the children." Wilkinson observed that the two oldest boys appeared to be afraid of Mother. Wilkinson observed Mother for an hour and "honestly felt like [she] was in danger when [Mother] was talking to [her.]" Another pastor at the church, Jaret Warren, testified that he spoke to Mother after childcare workers at the church found a sock inside E.G.'s diaper covering her genitals. According to Warren, Mother claimed E.G. "was being chastised." Mother also stated she was afraid "[J.C.] was going to go back in time and kill Jesus." Mother testified that she kept a sock in E.G.'s diaper as an "armor of protection" from her car seat buckle. Mother disputed the testimony that she told a church worker that she had given birth to Satan's children. Warren asked Mother if she was taking antidepressant medication and Mother stated that she had been prescribed medication, but she was not currently taking the medication. Warren described Mother's behavior as "erratic" and "frantic." Warren was concerned for E.G.'s safety and contacted the Department.

3

Around 9:30 p.m., Department investigator Dustin Pierce interviewed Mother at her residence after she and the children had left the church. According to the investigator, Mother was not coherent and was making strange comments.

A few hours later, Pierce was called back to Mother's home by Amarillo Police Officer Matthew Brush. Brush was investigating Mother's report that her boys had been kidnapped. However, Brush quickly determined that the boys were with J.C. According to Brush, Mother was "acting very strangely." She was pacing, talking to herself, and saying random things, such as, "[T]hey just don't listen. Y'all need to get him. They're listening to us." Mother was holding E.G., but she was not supporting E.G.'s head. E.G. was "just kind of flailing around." Brush was concerned for the welfare of E.G. because he did not feel like Mother could take care of herself, much less E.G. Brush testified that Mother was engaging in conduct that could endanger E.G.'s emotional or physical well-being. Brush arrested Mother for an outstanding traffic warrant and Pierce took possession of E.G. Pierce asked Mother to give him the names of possible placements for E.G., but Mother refused. Mother did admit to Pierce that she had a history of postpartum depression and she had not taken any medication in several years.

On January 12, 2020, at 1:30 p.m., Officer Michael Cote was dispatched to Mother's home for an assault. As Cote approached Mother's home, maternal grandmother flagged him down. Cote observed that maternal grandmother was "obviously distressed." She told Cote that Mother had held her against her will and assaulted her for several hours. According to Cote, maternal grandmother was hysterical, crying, and complaining of pain in her chest. Maternal grandmother told officer Cote that Mother had punched, kicked, and bitten her. During the assault, Mother grabbed a broken

4

piece of glass and carved a cross into maternal grandmother's forehead. Cote also noted that maternal grandmother had multiple bruises on her arms, bite marks across her chest and arms, and hair missing from her forehead.

Mother testified she began arguing with maternal grandmother around 4:00 a.m., and that the argument turned into a physical altercation. Mother acknowledged hitting maternal grandmother in the eye, which caused her eye to swell shut. Mother admitted she "reached out with a piece of glass" which made a cross formation in the middle of maternal grandmother's forehead. Mother also admitted to biting maternal grandmother multiple times on her breast. Mother testified that she was in a "hyper[-]religious state" at the time of the assault. Mother further admitted she urinated on maternal grandmother after the assault. Mother claimed that she received injuries in the attack, but she did not seek treatment for any injuries.

Mother was arrested and incarcerated in the Randall County Jail. She was indicted for the third-degree felony offense of assault of a family member by impeding breath or circulation. Mother was deemed incompetent to stand trial and was transferred to the state hospital for evaluation and treatment for psychosis, depression, and suicidal ideation. During her stay at the state hospital, Mother was diagnosed with post-traumatic stress disorder and depression. She was prescribed Lamictal, a mood stabilizer, and Effexor for her depression. Later, Mother was prescribed Wellbutrin for depression and BuSpar for her anxiety. Mother was released from the state hospital after three months and was discharged to the Randall County Jail. In August of 2020, Mother pled guilty to the felony assault charges and was placed on five years' deferred adjudication probation.

5

At the time E.G. was removed, Father was incarcerated in the Randall County Jail for violations of his federal parole. Father told the caseworker he had used methamphetamine for many years and he had used methamphetamine recently. He also said he had used methamphetamine with Mother.

Father's criminal history dated back to 2005 and included a conviction for the offense of conspiring to possess, with intent to distribute, 100 kilograms or more of marijuana for which he received a sentence of five years in federal prison and five years of supervised release. Father admitted to using and possessing methamphetamine while on parole resulting in his confinement in 2012 for ten months and in 2015 for twenty-one months. In August of 2019, he was arrested for possession and using methamphetamine and marijuana. Father was then incarcerated for violating his federal supervision from January 5, until October of 2020.

After Father was released from jail in October of 2020, he resumed his relationship with Mother. He completed most of the requirements of his service plan after he was released from jail; however, he did not maintain sobriety. Father relapsed in January of 2021 and used methamphetamine for "a week or two." Father tested positive for methamphetamine in January, February, and May of 2021. Father has a long history of drug abuse and he has relapsed four times in the last ten years. Father did not seek drug treatment during the pendency of this case, and he is not participating in a twelve-step program. The caseworker told Mother separately, and Mother and Father together, that Father could not be a caretaker for E.G. and that his drug use could affect Mother's reunification with E.G.

6

In August of 2020, after she was released from jail, Mother began to work the services in her family plan of service. One of Mother's service providers was DeLois Hinders, a licensed professional counselor. Hinders provided individual counseling to Mother and supervised therapeutic visitation between E.G. and Mother and Father.

Hinders testified the Department became involved with Mother after a psychotic episode. According to Hinders, "[Mother] had become hyper[-]religious, that there was some paranoia about sexual abuse of [E.G.]. She was behaving in some strange ways. She had a violent altercation with her mother, and that was–there were many kinds of confusing hallucinatory experiences she was having at the time." Mother told Hinders she was acting in self-defense and anger when she assaulted maternal grandmother, and she continues to have angry feelings toward maternal grandmother. Hinders opined a psychotic episode can have violent tendencies towards others and it would be concerning if it occurred around a child.

Hinders recounted the events that precipitated Mother's "psychotic break" in January of 2020: Mother and Father's relationship was deteriorating; Father had been arrested and there had been a separation; Mother was caring for a newborn and three other children; she was on call at work; she was not sleeping well; she quit or lost her job; and she was not making her mortgage payment. Hinders diagnosed Mother with unspecified depressive disorder and unspecified personality disorder. Hinders does not know how long Mother was psychotic before the January 2020 episode. According to Hinders, Mother had struggled with anxiety and depression off and on since her teenage years. Hinders did not obtain any information from family members concerning Mother's mental health history and relied only on what Mother reported. Hinders was unaware of

7

Mother's history of attempted suicide after J.C. and Mother separated in 2016.

Hinders's current recommendations are that Mother remain compliant with her psychiatric treatment and medications prescribed by her psychiatrist, and that she continue individual counseling. Hinders noted that Mother reported a history of marijuana use and she was not compliant with the portion of her treatment plan for her recovery for her substance abuse because she continued to be around Father who was a known substance abuser. Hinders's main concern is Mother's ability to be independent of her relationship with Father and her ability to take care of herself and protect E.G. in the event Father relapsed. Hinders recommended that Mother rent a place in her own name and put some distance between herself and Father after he was released from prison. Instead, Mother and Father continued to live together after his release and after he relapsed in January of 2021.

During the time Hinders spent with Mother, she did not see anything in the sessions that suggested Mother would be a danger to E.G. or to anyone. The therapeutic visits are going well, and Mother actively participates in the visits. In the beginning, E.G. had separation anxiety and it "flared up" throughout May and June of 2021. According to Hinders, Mother and E.G. have bonded, particularly in the last three sessions.

Maternal aunt and uncle filed an intervention seeking managing conservatorship of E.G. Maternal aunt testified that Mother exhibited behavior growing up where she randomly talked to people who were not present. She "was always angry, aggressive, she was physically abusive, mentally abusive, verbally abusive. She would also attack anything." Maternal aunt observed Mother talking to walls at various times. According to

8

maternal aunt, Mother had been prescribed several medications for her mental health. However, Mother refused to take the medications as prescribed. "[Mother] would wean herself off when she wanted because she would think she was better, and then she would self-medicate." Further, she has observed medications in Mother's home that were prescribed to others which she alleges Mother stole from facilities where she worked. Maternal aunt and uncle decided to seek custody of E.G. after a permanency hearing where Mother "came off very hostile and aggressive towards any comments or questions to be asked or answered. And it was continuous. She couldn't stop and she just kept going."

Mother was diagnosed with depression and anxiety in nursing school, and she has a history of PTSD related to sexual abuse. Mother testified that she had previously been prescribed Xanax. She denied abusing prescription drugs, stating that she always took her medication as prescribed. However, she also testified that she has been prescribed antidepressants and antianxiety medication throughout her adult life and stopped taking the medication "because I don't want to take it." Mother admitted that, in the months before her "psychotic break," she had stopped taking Xanax and was self-medicating with marijuana and alcohol because "it helped her cope with pain and anxiety." She testified she was currently under the care of a psychiatrist in Plainview, and she is compliant with her prescribed medication.

Mother has known Father since the summer of 2018, and they have lived together "off and on" since April of 2019. E.G. was born in May of 2019. In September of 2019, when Father was arrested for possession of methamphetamine, Mother "kicked him out of the house" but she claims she was not privy to the details of his arrest. She was only

9

told that it was a probation violation. Mother was aware Father had issues with substance abuse but denied she was aware of him using after E.G. was born. Mother admitted she used marijuana with Father in the past. The last time she used marijuana was before she was arrested in January of 2020.

Mother's house was foreclosed while she was incarcerated. After she was released from jail, she moved to Friona and lived with the paternal grandmother until Father was released from prison in October of 2020. Mother and Father broke up intermittently after he was released from prison due to the "stress of the CPS and the court proceedings."[2] They have resided in their current residence in Hereford since January of 2021. They do not have a lease, but they plan to negotiate a rent-to-own arrangement. After Father relapsed in January, he stayed with some of his friends "for about a month." When he got a clean urinalysis in February, he moved back into the home with Mother.

Mother and Father have set up a bedroom with a television for E.G. Mother's therapeutic visitation with E.G. is going well and she continues to have supervised visitation with her three sons.

Mother has been an R.N. since 2004. She is currently employed by Country View Living making $30 to $32 an hour. Mother's work hours vary, but she typically works three days a week from 6:00 p.m. to 6:00 a.m. Mother testified that paternal grandmother would keep E.G. at night because Father also works nights. Mother has "looked into"

---

[2] Father's family plan of service required that he participate in anger control training due to his reports of domestic disputes between him and Mother.

calling daycares for E.G., and she has inquired about changing her work schedule from the night shift to the day shift. Mother denied telling anyone that Father would be keeping E.G. while she was at work. Mother has a backup sitter but cannot remember her name.

According to the caseworker, in May or June of 2021, Mother and Father told her that the plan going forward was that Father would be the primary caregiver for E.G. because Mother would work nights. The caseworker told Mother and Father that the Department objected to Father providing primary care for E.G. The caseworker strongly encouraged Mother to obtain her own housing separate and apart from Father due to Father's substance abuse and the history of the relationship between Mother and Father.

The Department's major concern remains Mother's mental health stability. The caseworker testified there has been no resolution to her mental health issues and Hinders has not released Mother from her individual counseling. The caseworker opined that Mother was unable to care for the emotional and physical needs of E.G. now and in the future. A drug relapse that happened in the home could affect the stability of the home and pose an emotional and physical danger to E.G. The caseworker testified that it was in E.G.'s best interest that Mother's parental rights be terminated based on Mother's continued relationship with Father, Father's drug abuse history, Mother's willingness to leave E.G. in Father's care, and Mother's failure to work toward some of the goals recommended by Hinders for her to be independent of a relationship with Father. She further testified that it is in E.G.'s best interest that Father's parental rights be terminated based upon his history of methamphetamine use, his relapse in January of 2021, and his recent positive hair strand test for methamphetamine.

11

E.G. is placed with a maternal aunt and uncle who have intervened in the proceedings seeking managing conservatorship of E.G. E.G. is doing "very well" in this placement. All of E.G.'s needs are being met, including her medical, dental, and psychological needs. The Intervenors have become a licensed foster home since E.G. was placed with them. They have arranged for E.G. to visit with her brothers two to three times a month. E.G. is "extremely excited" to return to the placement after visits. The caseworker testified that it was in E.G.'s best interest to remain in her current placement. If parental rights are terminated, the Intervenors plan to adopt E.G.

On September 2, 2021, the associate judge emailed his ruling ordering a monitored return of E.G. to Mother. That same day, Intervenors filed a request for de novo hearing. On September 7, 2021, the associate judge signed an order on monitored return that specified that Mother's unsupervised possession of E.G. would not begin until Father moved to a residence separate from Mother, that Father would have supervised visits at the Department, and he would have no contact with the child while Mother had possession of E.G. Intervenors filed objections to this order.

In October of 2021, the Honorable James W. Anderson granted Intervenors' request for a de novo hearing and considered the entire record from the prior hearings. The trial court terminated Mother's parental rights to E.G. on the grounds of endangering conditions and endangerment. See TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).[3] The trial court also found that termination was in the best interest of E.G. See § 161.001(b)(2).

---

[3] Further references to provisions of the Texas Family Code will be by reference to "section ___" or "§ ___."

The trial court terminated Father's parental rights to E.G. on the grounds of endangerment and failure to comply with a court order that established actions necessary to obtain return of the child. *See* § 161.001(b)(1)(E), (O). The trial court also found that termination was in the best interest of E.G. *See* § 161.001(b)(2). The Department was appointed the permanent managing conservator of E.G.

Mother and Father timely appealed the resulting judgment. On appeal, Mother and Father contend the trial court erred in exceeding the scope of review of the de novo hearing. Mother also challenges the sufficiency of the evidence to support the trial court's findings under the predicate grounds, and the finding that termination is in the best interest of E.G.

Standard of Review

When reviewing the legal sufficiency of the evidence in a termination case, the appellate court should look at all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *Id.* Even evidence that does more than raise surmise or suspicion is not sufficient unless that evidence can produce a firm belief or conviction that the allegation is true. *In re K.M.L.,* 443 S.W.3d 101, 113 (Tex. 2014). If, after conducting a legal sufficiency review, we

13

determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven was true, then the evidence is legally insufficient, and we must reverse. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266).

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *Id.* We must also consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* If, considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

### Applicable Law

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.,* 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Recognizing that a parent may

14

forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *See id.*

In a case to terminate parental rights under section 161.001 of the Family Code, the petitioner must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007; *In re J.F.C.,* 96 S.W.3d at 264. Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.,* 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.,* 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.*, 280 S.W.3d at 894-95.

The clear and convincing evidence standard does not mean the evidence must negate all reasonable doubt or that the evidence must be uncontroverted. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). The reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Id.* The factfinder also enjoys the

15

right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any witness. *Id.* Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive. *In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ).

The appellate court cannot weigh witness credibility issues that depend on demeanor and appearance as the witnesses are not present. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). Even when credibility issues are reflected in the written transcript, the appellate court must defer to the factfinder's determinations, if those determinations are not themselves unreasonable. *Id.*

A determination of best interest necessitates a focus on the child, not the parent. *In re B.C.S.,* 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.). Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.,* 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006).

In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6)

16

the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* "[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See In re E.C.R.*, 402 S.W.3d at 249. The best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *In re N.R.T.,* 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). We must also bear in mind that a child's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in determining best interest. *See In re K.C.,* 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

Analysis

De Novo Review

In Father's sole issue and Mother's first issue, they contend the trial court erred by exceeding the scope of de novo review requested by Intervenors. Father and Mother argue Intervenors did not plead for a de novo determination concerning termination of the parent-child relationship between Mother and Father and only asked for a de novo

hearing clarifying the terms of the monitored return. They also say the referring judge went beyond a de novo review of the order for monitored return and sua sponte conducted a new trial. We disagree.

The record reflects that Intervenors sought two forms of relief in the court below following the associate judge's ruling of September 2, 2021, granting a monitored return. First, on September 2, Intervenors timely filed a request for a de novo hearing. *See* § 201.015(a) ("[a] party may request a de novo hearing before the referring court by filing with the clerk of the referring court a written request not later than the third working day after the date the party receives notice of the substance of the associate judge's [ruling or order]."). In their written request for de novo hearing, Intervenors sought a de novo hearing to include: (1) the Department remaining managing conservator; (2) Mother having a monitored return; (3) termination of parental rights of Mother and Father; (4) adoption by Intervenors; and (5) naming Intervenors managing conservators. *See* § 201.015(b) (a request for de novo hearing must specify the issues that will be presented to the referring court); *In re L.R.,* 324 S.W.3d 885, 890 n.5 (Tex. App.—Austin 2010, orig. proceeding) ("[T]he de novo hearing before the referring court is limited to those issues raised in the hearing request."). Second, on September 8, Intervenors filed an "objection to order for monitored return" in response to a proposed order for monitored return.

At the outset of the de novo hearing on October 1, 2021, Intervenors' counsel requested the court to consider the issues outlined in their request for de novo hearing. Because the Intervenors' request was timely filed and specifically identified the issues to be presented, we conclude that the issue of termination of parental rights was properly before the referring court. We reject Father's and Mother's contention that the trial court

18

exceeded the scope of de novo review. Accordingly, we overrule Father's sole issue[4] and Mother's first issue.

Sufficiency of the Evidence under Section 161.001(b)(1)(D) and (E)

In her second issue, Mother challenges the legal and factual sufficiency of the evidence to support the termination of her parental rights under subsections 161.001(b)(1)(D) and (E). Ordinarily, only one statutory predicate ground is required to support termination when there is also a finding that termination is in the child's best interest. *In re A.V.,* 113 S.W.3d at 362. However, in light of the Texas Supreme Court opinion in *In re N.G.,* we review the trial court's findings under both subsections (D) and (E) when raised on appeal because of the potential consequences to Mother's parental rights in a future proceeding concerning a different child. *In re N.G.,* 577 S.W.3d 230, 235-37 (Tex. 2019) (per curiam).

A trial court may order termination of a parent-child relationship if the court finds by clear and convincing evidence that a parent has knowingly placed or knowingly allowed a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child and/or engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* § 161.001(b)(1)(D), (E). Both subsections (D) and (E) require proof of endangerment. To "endanger" means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *Boyd,* 727 S.W.2d at

---

[4] Father does not challenge the sufficiency of the evidence to support the grounds for termination or the best interest finding.

533. A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.,* 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffer injury. *In re N.K.,* 399 S.W.3d 322, 330-31 (Tex. App.—Amarillo 2013, no pet.).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the child. *See In re B.S.T.,* 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.,* 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied). Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *In re W.S.,* 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.* Thus, subsection

(D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle*, 16 S.W.3d at 394.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions, but also by the parent's omission or failure to act. *In re M.J.M.L.,* 31 S.W.3d 347, 350-51 (Tex. App.—San Antonio 2000, pet. denied); *Doyle*, 16 S.W.3d at 395. To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re E.P.C.*, 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.). The specific danger to the child's well-being need not be established as an independent proposition but may be inferred from parental misconduct. *In re B.C.S.*, 479 S.W.3d at 926. "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.,* 283 S.W.3d 336, 345 (Tex. 2009). Because the evidence pertaining to subsections 161.001(b)(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.R.J.M.*, 280 S.W.3d at 503.

A parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re R.W.,* 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Suicidal ideation may also contribute to a finding that a parent engaged in endangering conduct. *Id.*

21

Here, the evidence demonstrates that Mother had a history of depression and anxiety since high school. Mother had been prescribed medication to help control the symptoms of her depression and anxiety, but she refused to take advantage of these remedies. Instead, Mother would wean herself off the medication and resort to self-medicating with alcohol and marijuana to alleviate her symptoms. In May of 2016, after separation from J.C., Mother attempted suicide by taking ten Xanax tablets and drinking an eighteen pack of beer. Mother admitted to the investigator in January of 2020 that she was suffering from postpartum depression, but she had recently stopped taking her medication. Mother's mental instability was such that at that time, she experienced erratic behavior, auditory and visual hallucinations, hyper-religious thoughts, and paranoia. During a psychotic episode a few days later, she brutally assaulted maternal grandmother. Mother was deemed incompetent to stand trial and received medical intervention at the state hospital. After her discharge, she received ongoing treatment by a psychiatrist. Moreover, Mother has not taken the necessary steps to protect her sobriety or remedy the instability of the home as she remains in a relationship with Father who has a history of substance abuse and incarceration. The trial court could have reasonably inferred that Mother would continue her pattern and practice of providing an unstable and abusive home for E.G. that has the potential to compromise her emotional and physical well-being. *See In re N.M.L.,* No. 07-17-00310-CV, 2018 Tex. App. LEXIS 607, at *14 (Tex. App.—Amarillo Jan. 19, 2018, pet. denied) (mem. op.) (physical violence in the home leads to an unstable and unpredictable environment for child). While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, "[w]hen a parent's mental state allows the parent to engage in conduct that

22

endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights." *In re P.W.,* 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

The evidence showed that before and after E.G.'s birth, Mother did not take the medication that was prescribed for her depression and anxiety. The trial court could have concluded that Mother's failure to take the medication after E.G.'s birth endangered E.G.'s well-being. *See In re K.G.,* 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied) ("[T]he trial court could have chosen to believe that Mother's . . . failure to . . . take steps to treat her mental health issues demonstrated an inability to provide [the child] with a safe environment.").

The trial court also heard evidence of Father's drug conviction and parole violations, his use of methamphetamine before and after E.G.'s birth, his use of methamphetamine with Mother, Mother's admission that she and Father used marijuana, his admission to using methamphetamine during the time he lived with E.G. and Mother, and his relapse shortly before trial. The trial court could have concluded that Mother's ongoing relationship with Father jeopardized her substance abuse recovery, and posed a risk to E.G.'s emotional and physical well-being. "[A] parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions outlined in subsections (D) and (E)." *In re J.J.,* No. 07-13-00117-CV, 2013 Tex. App. LEXIS 11194, at *12 (Tex. App.—Amarillo Aug. 29, 2013, no pet.) (mem. op.). The evidence that a parent allowed a child to be around persons using drugs can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct

23

endangering the child's well-being under subsection (E). *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied).

Having examined the entire record, we find that the trial court could reasonably form a firm belief or conviction that Mother knowingly placed or knowingly allowed E.G. to remain in conditions or surroundings which endangered her physical or emotional well-being and engaged in conduct or knowingly placed E.G. with persons who engaged in conduct which endangered E.G.'s emotional and physical well-being. The same evidence is factually sufficient to support the trial court's affirmative finding. We overrule issue two.

Best Interest

In her remaining issue, Mother challenges the factual and legal sufficiency of the evidence to support the best interest finding made under section 161.001(b)(2).

We begin our analysis of E.G.'s best interest having just concluded that there was legally and factually sufficient evidence presented to support the trial court's findings under section 161.001(b)(1)(D) and (E). The evidence submitted to prove the statutory predicate grounds for termination outlined above is probative that termination is in the best interest of E.G. *In re E.C.R.,* 402 S.W.3d at 249; *In re C.H.,* 89 S.W.3d at 28.

The trial court's determinations that Mother knowingly placed or allowed E.G. to remain in conditions or surroundings which endangered her physical or emotional well-being, and engaged in conduct or knowingly placed E.G. with persons who engaged in conduct which endangered E.G.'s physical or emotional well-being supports the proposition that termination is in E.G.'s best interest under the second and third *Holley* factors. *Id.* Mother's untreated mental health issues gave way to behavior that resulted

24

in E.G.'s removal and constituted conduct that endangered E.G.'s physical and emotional well-being. *In re M.P.,* No. 02-14-00032-CV, 2014 Tex. App. LEXIS 8689, at *54-55 (Tex. App.—Fort Worth Aug. 7, 2014 no pet.) (mem. op.) (per curiam) (a parent's failure to take medication as prescribed can expose a child to endangerment of her emotional or physical well-being). Moreover, Mother's decision to continue her relationship with Father, who had a significant substance abuse and relapse history and numerous incarcerations, subjects E.G. to a life of uncertainty and instability that further endangers her physical and emotional well-being.

Stability and permanence are paramount in the upbringing of children. *In re J.D.,* 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The factfinder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *Id.* at 119-20. The trial court had before it evidence reflecting the precarious nature of Mother and Father's relationship. Mother met Father after he was paroled for a federal drug offense in 2018. Father violated his parole several times by using methamphetamine and he was sentenced to prison multiple times. In August of 2019, Father was living with Mother and E.G. when he was arrested for violation of his parole by using and possessing marijuana and methamphetamine. When Father completed his latest prison term in October of 2020, Mother and Father resumed their relationship, but they separated several times due to the stress of the underlying proceedings. In January, February, and May of 2021, Father relapsed and submitted hair follicle drug screens that were positive for methamphetamine. The trial court also heard evidence that Father had relapsed four times in the span of ten years. Hinders testified that Mother was not compliant with the

25

substance abuse recovery portion of her treatment plan because she continued to have a relationship with Father and heavily relied on him as a support system. Hinders also recommended that Mother continue with her individual counseling, but Mother's last session was in April of 2021. Significantly, Mother failed to articulate a plan for her mental health treatment going forward.

We do acknowledge the testimony that therapeutic visitation was going well and that Mother and E.G. had bonded during the last three visitations. Mother testified that she was employed, had furnished E.G.'s room, and was checking daycare options for E.G.

Conversely, the Intervenors are providing a drug-free environment and the stability, structure, security, and consistency that E.G. needs. E.G. has been living with the Intervenors for seventeen months. The evidence shows that E.G. is strongly bonded with her foster family and they desire to adopt her. According to the caseworker, E.G. is thriving in the home and she is well cared for in this placement. When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, and are well-cared for by them. *In re S.R.,* 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Further, the Department's plan for E.G.'s adoption provides permanence and stability for E.G. and weighs heavily in favor of the trial court's conclusion that termination of Mother's parental rights is in the best interest of E.G.

We conclude the evidence is legally and factually sufficient to establish a firm conviction in the mind of the trial court that termination of Mother's parental rights is in the

26

best interest of E.G. We overrule Mother's third issue challenging the best interest determination.

We affirm the trial court's order terminating Mother's parental rights to E.G.

## Conclusion

Having overruled Father's sole issue and Mother's three issues, we affirm the judgment of the trial court terminating Mother's and Father's parental rights.


Judy C. Parker
Justice